*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J.D. TURNER-STONE, Minor.

UNPUBLISHED
June 22, 2023

No. 364002
Wayne Circuit Court
Juvenile Division
LC No. 2016-522564-NA

Before: SWARTZLE, P.J., and CAVANAGH and LETICA, JJ.

PER CURIAM.

Respondent-father appeals as of right the termination of his parental rights to his child under MCL 712A.19b(3)(g) (failure to provide proper care for child with no reasonable expectation that parent will be able to do so within a reasonable time given child's age) and MCL 712A.19b(3)(j) (reasonable likelihood that child will be harmed if returned to parent's home based on parent's conduct or capacity). On appeal, respondent-father argues the trial court erred by determining that statutory grounds existed to terminate his parental rights and that it was in the child's best interests to do so. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July 2021, Children's Protective Services received a complaint alleging that the child was born positive for cocaine and tetrahydrocannabinol (THC). The following month, the Department of Health and Human Services (DHHS) petitioned for the termination of respondent-mother's parental rights[1] and sought placement with 37-year-old respondent-father, who was not

---

[1] Although respondent-mother is not a party to this appeal, by way of background, we note that she had six children. Her 17-year-old son resided with his maternal grandmother, who was his legal guardian. In 2012 and 2013, another court terminated respondent-mother's parental rights to three children. The underlying issues in those matters were substance abuse, physical neglect, threatened harm, and domestic violence. In 2016, the court ordered another child removed from respondent-mother's care; however, after she successfully completed court-ordered services, the matter was closed with the child's father providing care for her. Respondent-mother also had a

a respondent at that time. On September 1, 2021, just nine days after the court placed the child with respondent-father on the condition that respondent-mother's parenting time be "supervised by DHHS only," respondent-father took the child to respondent-mother's hotel room. Respondent-mother conceded she was intoxicated on alcohol and drugs. Video from the hotel showed that the parents had an altercation. Respondent-father physically assaulted respondent-mother and displayed a gun. As respondent-mother fled, she noticed a bullet fly by her head. Respondent-father placed an infant car seat carrier ("carrier") down between two parked cars and entered the hotel room. Respondent-father took the keys to respondent-mother's car, placed the unsecured carrier on the front passenger seat,[2] and drove away. The car stopped briefly, corresponding with respondent-mother's testimony that she heard more gun fire as she hid in the hotel's lobby. Respondent-mother later testified that she never saw the shooter. Respondent-mother's brother was injured in the affray.

Inkster Police Officers Stephon Smith and Sean Kritzer were on patrol when they heard gunshots and saw a muzzle flash. Smith testified that he saw a black male with short hair and a beard, who was wearing a white t-shirt, shooting from a car. As the officers approached, they activated their lights and sirens. The car fled and a chase ensued through residential areas at speeds of 60 to 70 miles per hour.

When the officers caught up with the car, neither respondent-father nor the infant were inside. Instead, the vehicle continued to roll until it crashed into a parked trailer. The officers noticed that the car's rear-passenger window was broken, seemingly by a bullet. The officers also saw a semi-automatic pistol on the front-passenger seat that felt slightly warm to the touch, indicating recent firing. The police later recovered numerous shell casings from inside the vehicle. Subsequent forensic testing concluded that a latent fingerprint discovered on the weapon's magazine matched respondent-father's right middle finger. The police also determined that the pistol was stolen.

A manhunt ensued and DHHS quickly filed an amended petition seeking temporary custody over the child as to respondent-father. The petition detailed respondent-father's lengthy criminal history, including his numerous domestic-violence convictions. The petition also discussed a 2017 removal of the child's half-sibling from respondent-father's care due to respondent-father's incarceration and inability to provide for him. Despite the age of that matter, respondent-father had not completed his treatment program.

On September 3, 2021, respondent-father appeared at the court hearing via Zoom. DHHS sought removal of the infant. DHHS attempted to reach respondent-father via phone, but its calls were not returned, even though respondent-father had phone contact with the police.

---

lengthy criminal history, including a drug-related conviction and numerous convictions for operating while intoxicated.

[2] The base for the carrier was in the rear seat of respondent-mother's car.

Respondent-father admitted that he was aware the authorities wanted him to turn himself in. However, he insisted that the allegations made against him were untrue.[3] He urged further investigation, referencing the hotel cameras, and he vehemently denied that the infant was at the hotel. Respondent-father further denied shooting at anyone and asserted that he could not run from the police due to a prior injury. Respondent-father reported contacting both the police and DHHS after he learned of news reports pertaining to the incident and search.

Respondent-father also voiced his opposition to placing the infant with respondent-mother's relatives. Instead, respondent-father proposed his sister and cousin. Respondent-mother proposed her sister, who was a registered nanny.

At the conclusion of the hearing, the trial court credited DHHS's testimony and determined that the child was at risk with respondent-father. The court ordered the child to be placed with DHHS and respondent-father said that he would bring the infant to the agency.

Thereafter, respondent-father was arrested on numerous felony charges and remained incarcerated throughout these proceedings.[4] On September 27, 2021, DHHS filed a second amended petition, seeking termination of respondent-father's parental rights. In December 2021, the child was moved from a nonrelative foster care placement into the home of a maternal relative.

After a hearing on the termination petition, the trial court determined that DHHS had proven two statutory grounds, MCL 712A.19b(3)(g) and (j), to terminate respondent-father's parental rights. Although the trial court acknowledged that respondent-mother never saw respondent-father shoot the gun, drive the car, or take the child, it determined that "there [was] a lot of circumstantial evidence that points towards [respondent-father] as being the individual who fired [the] shots in question." A best-interests hearing followed and the trial court terminated respondent-father's parental rights, but not respondent-mother's parental rights. More specifically, the trial court recognized respondent-mother's continuous efforts during the pendency of the case to address her parenting barriers and concluded that the parents were "differently situated." As to respondent-father, the court recognized the child's placement with a relative, but decided that the "severity and serious nature of the circumstances that night, really call[ed] into

---

[3] Respondent-father told the police that he went to respondent-mother's hotel room, finding her, her brother, and another gentleman smoking crack cocaine. An argument ensued and respondent-father left the hotel room. While walking up Michigan Avenue, respondent-father heard several gunshots and saw a police car pass him. One of the videos presented contradicted respondent-father's claim that others were present in respondent-mother's hotel room. Moreover, a key to respondent-mother's hotel room was found on the driver's side floorboard of the crashed car.

[4] Respondent-father was charged with assault with the intent to commit murder, MCL 750.83, assault with the intent to commit great bodily harm, MCL 750.84, three counts of felonious assault, MCL 750.82, intentional discharge of a firearm from a motor vehicle, MCL 750.234a, carrying a concealed weapon, MCL 750.227, third-degree fleeing and eluding a police officer, MCL 257.602a(1) and (3)(a), second-degree child abuse, MCL 750.136b(3), domestic violence, MCL 750.81(2) and (5), and five counts of felony-firearm, MCL 750.227b. Wayne County Circuit Court Docket No. 2022-000721-01-FC.

question [respondent-father's] ability to be an effective parent for his child." The trial court entered an order terminating respondent-father's parental rights on November 8, 2022, and respondent-father appealed.

## II. ANALYSIS

Respondent-father argues the trial court erred when it determined statutory grounds existed for the termination of his parental rights and it was in the child's best interests to do so. We disagree.

## A. STATUTORY GROUNDS

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "The trial court's factual findings are clearly erroneous if the evidence supports them, but we are definitely and firmly convinced that it made a mistake." *Id*. at 709-710.

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). "Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Clear and convincing evidence "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (quotation marks, citation, and brackets omitted).

The statutory grounds at issue in this case are:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent. [MCL 712A.19b(3)(g) and (j).]

Respondent-father contends there was insufficient evidence to terminate his parental rights because this was a single incident, he had not been convicted of the criminal charges, and it was

unknown whether the child was in the car. Respondent-father also argues that respondent-mother was a poor witness, who, due to her intoxication, did not recall whether the child was present, whether respondent-father shot the gun at her or whether respondent-father was even in her car. Furthermore, the gun discovered in respondent-mother's car only contained respondent-father's fingerprint on the magazine, not the gun itself.

Because neglect and criminal proceedings are distinct, respondent-father's lack of a criminal conviction for the events arising from the incident is unavailing.[5] See *People v Gates*, 434 Mich 146, 162-163; 452 NW2d 627 (1990); *In the Matter of Stricklin*, 148 Mich App 659, 662-666; 384 NW2d 833 (1986). Moreover, this Court has previously held that termination of parental rights under MCL 712A.19b(3)(j) "is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent . . . must have either caused or failed to prevent the child's injuries." *Ellis*, 294 Mich App at 35-36. Moreover, " '[i]t is not necessary that every fact be proven directly by a witness or an exhibit.' " *Moody v Pulte Homes, Inc*, 423 Mich 150, 171; 378 NW2d 319 (1985) (quoting SJI2d 3.10). Rather, " '[a] fact may be proven indirectly by other facts or circumstances, from which it usually and reasonably follows according to common experience and observation of mankind.' " *Id*.

In this case, video evidence showed respondent-father holding a carrier and arguing with respondent-mother outside her hotel room. In our review, the infant is plainly visible in the carrier, and, in fact, can be seen moving his arm. But, even accepting respondent-father's view that evidence of the baby's presence was entirely circumstantial, it was sufficient. Certainly, there would be no reason for respondent-father to have the carrier with him if it was empty.

And despite any weaknesses in respondent-mother's testimony, the video showed respondent-father leaving the carrier unattended between two cars in the parking lot, going into respondent-mother's room, coming out, placing the infant carrier in the front-passenger seat unsecured, and getting himself into the car before driving away. Officer Smith later accurately described respondent-father's appearance and clothing in recounting the driver's appearance during the ensuing police chase. The police also found a blanket in the carrier of the abandoned car, again suggesting the presence of the infant. The abandoned car's rear passenger window was broken and the vehicle contained numerous bullet casings and the recently fired pistol on its front passenger seat. Respondent-father's fingerprint was on the gun's magazine. And, in direct contradiction to the video, respondent-father, albeit not under oath, denied driving respondent-mother's vehicle and bringing the infant with him to the hotel. The evidence further demonstrated that respondent-father assaulted respondent-mother and fired multiple shots out of the back passenger-side window of her vehicle. Thereafter, respondent-father led the police on a chase,

---

[5] In Docket No. 2022-000721-01-FC, a jury convicted respondent-father of two counts of felonious assault, two counts of felony-firearm, intentional discharge of a firearm from a motor vehicle, carrying a concealed weapon, fleeing and eluding a police officer, domestic violence, and second-degree child abuse. MRE 201(b), (c), and (e). The trial court imposed a sentence of 9 to 20 years' imprisonment for respondent-father's child-abuse conviction. *Id*.

traveling at excessive speeds, before fleeing on foot with the baby while respondent-mother's car continued rolling until it crashed into a parked trailer. Although this was a single incident, respondent-father's actions posed a serious risk of physical harm to the baby. Given the life-threatening nature of this incident as well as respondent-father's history, the trial court did not clearly err in concluding that there was a reasonable likelihood, based on respondent-father's conduct, that the child would be harmed if returned to respondent-father's home.[6] MCL 712A.19b(3)(j).

## B. BEST INTERESTS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014). "Best interests are determined on the basis of the preponderance of the evidence." *Id.* at 733.

"The trial court should weigh all the evidence available to determine the child[]'s best interests." *White*, 303 Mich App at 713. "[T]he focus at the best-interest stage has always been on the child, not the parent." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks and citation omitted, alteration in original). Factors to be considered include:

> the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption. [*White*, 303 Mich App at 713-714 (quotation marks, footnotes, and citations omitted).]

This Court reviews a trial court's determination regarding whether termination is in a child's best interests for clear error. *White*, 303 Mich App at 713. "The trial court's factual findings are clearly erroneous if the evidence supports them, but we are definitely and firmly convinced that it made a mistake." *Id.* at 709-710.

Respondent-father makes two arguments about why it was not in the child's best interests to terminate his parental rights. He first incorporates his earlier sufficiency argument. But, where the evidence supported a finding that respondent-father placed the infant at severe risk of harm under the clear-and-convincing standard, it was certainly sufficient to satisfy the preponderance-of-the-evidence standard applicable to a best-interests determination. Compare *Griffin v Griffin*, 323 Mich App 110, 123 n 8; 916 NW2d 292 (2018), with *In re LaFrance*, 306 Mich App at 733. Moreover, respondent-father had a history of domestic violence. In this case, he engaged in domestic violence against respondent-mother and assaulted her brother, repeatedly firing a semi-automatic pistol in the child's presence. Respondent-father also had an open neglect matter

---

[6] In light of our conclusion, we need not address the alternate ground for termination. See *Ellis*, 294 Mich App at 32.

pertaining to the child's half-sibling and the record suggested that he had not completed his treatment plan for that matter even though it began in 2017. The child involved in this case was approximately two months old at the time of the incident, was removed shortly after, and had minimal contact with respondent-father, indicating there was little bond between them. Considered in conjunction with the other factors enumerated in *White*, 303 Mich App at 713-714, we conclude that the trial court's best-interests determination was not clearly erroneous.

Respondent-father also contends that the trial court acted prematurely because the child was placed with a relative, the child's maternal aunt, and respondent-father could complete services while incarcerated.

> Although the trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests, the fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests[.] [*In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012) (quotation marks and citations omitted).]

"A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *Id.*

In this case, however, the trial court addressed the child's placement with his maternal aunt, recognizing that she was willing to adopt the child. Notably, respondent-father was opposed to placing the child with the child's maternal relatives and offered his relatives for consideration before the child was placed with a maternal relative in December 2021. Given respondent-father's violent assaults on her relatives, it is understandable that the maternal relative would not feel safe around respondent-father and would not want to have contact with him. See *In re Gonzales/Martinez*, 310 Mich App 426, 434-435; 871 NW2d 868 (2015). In light of this, the trial court did not clearly err in determining that it was in this young child's best interests to terminate respondent-father's parental rights, especially considering the severity of the incident along with respondent-father's documented history of domestic violence and long-term involvement in an earlier neglect proceeding.

Affirmed.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Anica Letica